In re Estate of Hiram Gómez Cintrón, Elsa Fedora Gómez Doittau, Petitioner, Ex parte. General Accident Fire & Life Assurance Corporation, etc., Petitioners and Appellees; Alonso Aguilar et al., Creditors, Respondents and Appellants.

No. 7571. Argued November 14, 1939.—Decided March 8, 1940.

J. Alemañy Sosa for respondents and appellants. Brown, González & Newson, and William P. Colberg for petitioners and appellees. Oscar Souffront for the judicial administrator.

Mr. Justice Wolf delivered the opinion of the court.

We have before us an appeal from an incident arising within the judicial administration of the estate of Hiram Gómez. The deceased had been a prominent insurance agent on the island and in such capacity had represented various English and American underwriters. On March 16, 1935, Mr. Henri Brown, as attorney for the Western Assurance

Company of Canada, United States Guaranty Co., of New York, Federal Insurance Company, of New Jersey, Hartford Fire Insurance Company of Connecticut, and the General Accident, Fire and Life Assurance Company of Perth, Scotland, hereafter to be described as "the companies," for all of which Gómez had acted as general agent, addressed a letter to the acting judicial administrator of his estate directing him to set aside and deposit in a separate account the premium payments collected or to be collected, on policies underwritten by said companies during the lifetime and through the agency of the deceased. Pursuant to an order of the competent district court, the acting judicial administrator, and thereafter the permanent one, deposited these specific collections in a special account.

In March 1936, the companies filed a petition in which they sought to have the premium collections already deposited in the special account, *supra*, delivered to their attorney, and also to have all premium accounts receivable assigned or transferred to said attorney. One of the common creditors of the deceased, Alonso Aguilar (subsequently joined by others), opposed the petition of the companies on the ground that the relationship of Hiram Gómez with the petitioning companies with regard to premiums was one of creditor and debtor, and hence that the companies should come in as general creditors. The companies, on the other hand, maintained that the premiums belonged exclusively to them and therefore formed no part of the funds of the estate proper. This is the only fundamental issue in the case. The judicial administrator filed a writing in which he prayed that before the court should order the disposition of the fund in controversy, the commissions of the deceased should be deducted therefrom and transferred to the estate as well as certain amounts for part payment of the administrator's fees and those of his attorney. The court granted the petition of the companies with certain provisions regarding the fees mentioned. No reference is made in the opinion concerning the

deduction of commissions, but we shall presume that whatever our ultimate conclusion, their amount will be duly accredited to the estate of Hiram Gómez.

Seven are the errors assigned by the appellants. Principally they object to the conclusion at which the court arrived in respect to the fiduciary relationship between the deceased and the companies. The district court held that such relationship was one of principal and agent and that the companies never parted with their title to the premiums in this case.

The initial assignment of error concerns the admission in evidence of the various agency contracts presented by the companies to prove the terms on which they dealt with Mr. Gómez. Appellants maintain that they were not sufficiently identified. In view of the stipulation subsequently filed by the parties, this error becomes unimportant for it is agreed in said stipulation that Hiram Gómez issued insurance policies as agent or representative of the companies. It appears in various other ways that Gómez was the general agent for the various companies.

The real question in this appeal is whether the amounts collected by the judicial administrator for premiums paid after Gómez' death belong to the companies or to the general assets of the estate. Hence let us recite the important portion of the stipulation filed by the parties to obviate the necessity of presenting evidence on the part of the petitioning creditors:

"6.—That in order to avoid a new hearing and delay in the decision of this case the parties hereto agree and stipulate that according to the accounting books of the deceased Hiram Gómez, the copies of the monthly remittance reports made by the deceased Hiram Gómez to the petitioning companies, and the copy of the monthly reports of collections made by the judicial administrator during the term of his administration, the following state of facts appears:

"A.—That Mr. Hiram Gómez issued insurance policies as agent or representative of said companies to the assured for the risk covered thereby.

"B.—The amount of said premiums when not paid in cash was charged to the current accounts to which the payments made by the assured, very often part payments, were credited by Mr. Hiram Gómez.

"C.—The amount of said premium was credited by Mr. Hiram Gómez in his books to the accounts of the insurance companies, also current accounts, after deducting the 25 per cent to which he was entitled as a commission.

"D.—After the last day of each month Mr. Hiram Gómez sent to the companies a list of the policies issued during the previous month and the premiums derived from each one of said policies, and should remit the total amount of said premiums after deducting his commission, and the premiums for cancelled policies, to the General and the Hartford, within sixty days and to the Western, United States and Federal, within forty-five days.

"After the last day of each month Mr. Hiram Gómez remitted to the companies sums of money to apply to the balances shown from the current accounts of said companies in his books by reason of premiums due, and to make said remittances Mr. Gómez drew against his accounts in banks of Puerto Rico.

"Mr. Gómez deposited in said account in the banks of Puerto Rico, which were current accounts in his own name only, the income from his businesses including the insurance premiums collected on the policies issued in the name of the companies.

"E.—In case that any assured failed to pay the amount of the premium of his policy or any part of said premium within the sixty days or forty-five days that Mr. Hiram Gómez had to remit to the companies and that said policy had not been cancelled within said terms, the companies had nothing to do with such loss, but the same was wholly charged to Mr. Gómez.

"Within said periods of sixty or forty-five days, Mr. Gómez could cancel flatly any policy issued within the month immediately preceding said term, already in form or reported to the companies, that is, without any liability on the part of the assured or of Mr. Gómez for the term that said policy had been in force before its cancellation.

"7.—That to the present stipulation are attached copy of the monthly reports of remittances made by Hiram Gómez to said insurance companies for the last year before his death, copy of the monthly reports of collections made by the judicial administrator during the term of his administration and the book where appear the current accounts carried by deceased, Hiram Gómez, with the

assured, and the current accounts carried by Mr. Hiram Gómez with the petitioning companies, and the claims of said petitioning companies to the judicial adminstrator for the amount of their credits.''

We have read the various documents, letters, certificates of authority, etc., presented in evidence by the companies and have found them to be substantially similar when it comes to his power of collecting premiums. Both from these agreements and the stipulated course of conduct between Gómez and the companies, it appears that his powers were extremely broad. The written authority undoubtedly was extended by the overt acts of the agent in his business dealings. We have no doubt that the course of dealings is pertinent and important to the determination of the fundamental question in this case. We must consider every admitted fact in order to decide whether the companies, at least after the 45 or 60 days period had elapsed, looked to Gómez exclusively for the payment of their premiums or merely considered him as a guarantor of that payment. In the first case the relationship between insured and insurer might be considered substituted by one of debtor-creditor between agent and insurer, or as a payment of the premium by accepting the personal credit or responsibility of such agent.

In the second instance, the liability of the agent would constitute an additional security to the principal and would not take away from the insurer a preferable right to collect the premiums.

Although the jurisprudence is not abundant, an independent investigation by us has disclosed some authorities which have not been cited by either of the parties. They shall be discussed at their proper place in this opinion.

The cases seem to fall into two general classes. There are those that consider the question of payment of the premium from the point of view of whether the company is liable on the policy even though the insured has not paid the premium either to the agent or the insurer. Then there

are others which consider the effect of charging the premiums to the agent whether he has received them or not.

The ordinary business custom plays an important role in all the cases in this field.

In 2 A.L.R. 1664, *et seq.*, we find the following discussion of cases: ·

"And in *Train* v. *Holland Purchase Ins. Co.*, (1875) 62 N. Y. 598, it was held immaterial that the premium was not in fact paid by the insured, where it appeaerd that a usage existed between the insurer and the agent, whereby the former charged the latter with the premium upon all policies applied for, and at stated periods settlements were made, and in accordance with this arrangement the agent applied for a policy under an agreement with the applicant that the insurer would charge the premium to the agent, and that the latter would give applicant credit ·for the premium.

"*     *     *     *     *     *     *

"And in *Wytheville Ins. & Bkg. Co.* v. *Teiger (Va.) supra* (18 S. E. 1C5), where there was no direct evidence that it was the insurer's practice to charge the agents personally with the premiums on policies sent to them, *but there was testimoney raising an inference that this was done, the court stated that if the premiums were in fact so charged,* then as between the insured and the company the premium was paid when the policy was delivered, *and observed that the rule was well settled that here the agent gives credit and the amount is charged to him by the insurer the transaction is equivalent to payment.*

"And in *Fidelity & C. Co.* v. *Willey,* Fred.) *supra* (80 F. 497), where as was the custom between the insurer and its general agent, the company charged the latter with the premiums on a renewal transmitted to him for delivery, and the agent delivered the policy to the insured without payment of the premium, *it was held that the insured's indebtedness was transferred to the agent,* and that as between the insurer and insured there was payment, and that a provision of the policy for prepayment of the premium could not be set up in avoidance of it.

"And in *Buckley* v. *Citizens' Ins. Co.*, (1907) 188 N. Y. 399, 13 L.R.A. (N. S.) 889, 81 N. E. 165, it was held that the first premium on a policy must be deemed, as between the insurer and the insured, to have been paid at the time the former's general agents extended credit to the insured, where the premium was charged· to the agents in their account with the insurer, pursuant to the gen-

eral course of dealing between them, which disregarded any arrangement the agents might make with the insured as to credit, notwithstanding that a note for the premium given by the insured to the agents did not mature until after an attempt had been made to cancel the policy, nor until after the destruction of the property, and that upon maturity it was taken up by the agents, who had discounted it, and was still held by them at the time of the action on the policy, they having been credited in the meantime in their account with the company with the amount of the premium unearned at the time of the attempted cancelation

"And in *Bang* v. *Farmville Ins. & Bkg. Co.*, (1876) 1 Hughes, 290, Fed. Cas. No. 838, where, according to custom, an insurance agent delivered a policy to a broker and with his knowledge charged him with the premium on the agent's books, and credited the insurer with the premium, and it appeared that it was the insurer's custom to charge premiums to its agents, it was held that it could not avoid the policy for nonpayment of premiums, although it provided that the insurer should not be liable until the premium was actually paid, and that anything less than a specific agreement clearly expressed in the policy should not be construed as a waiver of any printed condition

And in *White* v. *Connecticut F. Ins. Co.*, (1876) 120 Mass. 330, the evidence was held sufficient to justify a finding that the insurer accepted the credit given by its general agent to a broker as a payment of the premium, within a provision of the policy that the company should not be liable on the policy until the premium was actually paid, where there was evidence that it was the usual course of business for the general agent to deliver policies to the broker without requiring cash payment of premiums, but to charge the broker individually, and render a monthly statement, and that a large number of the company's policies with its knowledge, had been issued to brokers in this way, and that the policy in suit was so delivered."

From the case of *Horton* v. *Eagle Indemnity Ins. Co. et al.*, 171 A. 322, we take the following passages:

"The insurer's right to collect from the policyholders unpaid premiums charged to the agency depends upon the relations between the insurer and the agency. By the contracts the agency was obligated to pay all premiums. So for as it did pay them, it alone had the right to collect them from the policyholders. Paying them, it

might proceed against the policyholders either on the theory of subrogation or on their direct liability for the payment of money at their request. The payment entitled it to be treated as the assignee of the insurer's rights through subrogation and at the same time amounted to a loan to the policyholders. The agency in this respect property represented both insured and insurer. Responsibilty through promise to the insured to obtain and maintain insurance is consistent with its obligations to the insurer.

"*In respect to premiums unpaid either by the policyholder to the agency or by the agency for him to the insurer the right to collect them after the agency is terminated is not definitely arranged by the express terms of the contracts. Their implied terms, as within the parties' contemplation and, as shown by the effect of the express terms and by the course of business between the parties, are therefore to be ascertained.* The course of business is of aid as a practical construction in disclosing the common understanding the parties had of the meaning of the contracts and the results they were expected to accomplish. The legal incidents arising from the relationship and either upon performance or upon breach of the contracts are within their contemplation and to be regarded as implied terms.

"The premium itself is a debt due only the insurer, and, until the insurer had disposed of its rights therein, it has full legal and equitable title thereto. But disposal of its rights may be brought about through the operation of rules of law applicable to its contracts and conduct in pursuance thereof as well as by express statement and terms. *If the contracts thus show that the agency bought the insurer's right to collect the premiums on the policies it issued, they were the agency's property after the agency was terminated.*

"'The insurer's assignment of a premium may be conditional or absolute. Its book entry of a charge of the premium to the agent, although made with the agent's consent, is not enough to show an unrestricted assignment. It is no acknowledgment by the insurer that the premium has been paid. *Brown* v. *Insurance Co.,* 59 N. H. 298, 309, 47 Am. Rep. 205. *But the insurer's acceptance of the agent's individual credit as a payment of the premium is equivalent to its actual payment as between insurer and insured. Gaysville Mfg. Co.* v. *Insurance Co.,* 67 N. H. 457, 458, 36 A. 367. Authority elsewhere supports this view. (Citations.) The logical deduction is that, since the insurer may not claim nonpayment of the premium, it belongs to the agent. Otherwise the policyholder escapes.

"The deduction accords with the intent of the parties evidenced by the agency contracts, in the construction of which the course of business thereunder is elucidating. *The agent's agreement to be charged with the premiums was intended to be of their purchase unless it was of suretyship for the policyholders.* If he did not purchase the premiums but only guaranteed their payment, the policyholders remained the insurer's debtors. Until the surety pays, the insurer parts with no rights. The surety's agreement is security for the policyholders' primary debt to the insurer. But, if the insurer accepts the agent's agreement in substitution for the policy holders' liability to it, the agreement is not one of suretyship, but the right to collect the premiums is thereby sold to the agent.

"*As between purchase and suretyship, in no instance was payment of any premium sought by the insurer while the agency ran except from the agency. It looked alone to the agency for payment.* It carried an account with the agency made up of charges and credits, and the contract called for periodic settlements of the account. *Payment of the account was by check drawn against the agency's single bank deposit account.* There were no special deposits in segregation of premiums as separate trust funds. The agency acted as a general debtor and not as a fiduciary.

"*The agency had the right to extend credit for the premiums. Thereby it might deal with the policyholders on a personal basis.* It might carry an open account with each of them, charging in it the premiums for the policies of all the companies in which the policyholder was insured, as well as possible items of a different kind. The policyholder in settling the account was entitled to consider the agency his creditor, with no liability to the insurer.

"*This course of practice was known to the insurer and maintained with its consent.* It follows that the acceptance of the agency's credit for the premiums was intended to have full substitutional effect. Retention by the inslurer of right to collect premiums on policies issued by the ágency during its continuance would be inconsistent with the agency's permitted practices under the running of the agency contract. The insurer, looking alone to the agency for payment of the premiums, assigned all of its interest in them. The facts found manifest their sale. Neither the agency's failure to discharge its liability to the insurer upon the credit given it nor the termination of the agency restored any right to the insurer to collect premiums unpaid by the policyholder. The right was unconditionally and unreservedly transferred to the agency.

''Having thus bought the premiums on all policies the agency might issue; it was under no fiduciary obligation to account for them. They belonged to it to deal with as it pleased. *The clause in some of the contracts that premiums less commissions should be remitted to the insurer upon their payment to the agency does not alter the situation.* The clause is merely a provision for fixing a special date for payment of the agency's debt to the insurer in respect to premiums paid the agency. Nor does the clause in one of the contracts that until remittance of the amount due premiums collected by the agency were to be held as the property of the insurer and 'as a fiduciary trust' make a difference here. The course of dealings between the parties shows a waiver or cancellation of the clause. *The contract was the force for over three years, and the manner of payments and the business methods of the agency during the period were within the insurer's notice.* The understanding and expectation of both parties that observance of the clause was to be ignored is thus decisively indicated. The practices employed by the agency and accepted by the insurer amounted to a parol alteration or can-cellation of this term of the contract, and such a change is valid. *Warren* v. *Dodge,* 83 N. H. 47, 48, 138 A. 297, and cases cited.''

On the other hand; the case of *Alliance Insurance Co.* v. *City Realty Co.,* 52 Fed. (2d) 271, treats a similar question as follows:

''At the expiration of sixty days from the end of the month in which policies were written the agent was required to remit to each insurance company the 'balance' shown on the monthly report for the month during which the policies were written, whether or not the agent had collected the premiums. In other words, if the agent, after issuing a policy, did not cancel it within the time allowed for 'flat' cancellation and did not collect the premium, but extended further credit to the insured, then the agent, regardless of whether he ever collected the premium or not, became liable to the insurance company for 80 per cent of the premium, which 80 per cent had been included in the 'balance' reported at the end of the month in which the policy as written.

''The insurance companies did not deal with the policyholders except through the agent, and did not concern themselves with the method employed by the agent in keeping books of account, collect-ing premiums, or depositing in bank moneys collected. They simply

required the agent to remit the 'balances' regardless of collections.
‘‘＊    ＊    ＊    ＊    ＊    ＊    ＊

‘‘An insurance policy is a contract between the company and the insured in which the insured agrees to pay premium to the company. He may discharge his obligation by paying the premium to the agent, but his obligation is to the company. The agent agrees to collect the premium and remit the proceeds, less his commission, at the end of sixty days from the end of the month in which the policy is written. The company at its own risk gives the agent fifteen days from the end of the month in which the policy is written to collect the premium and then authorizes him, if he fails to collect in that time, to cancel the policy 'flat' without any liability on his part. If the agent does not collect and does not cancel in the time allowed for flat cancellation but prefers to extend further credit, the company permits him to do so but only on condition that he also become liable for the company's portion of the premium. His liability is not that of guarantor, but is an original undertaking. *The company, as a matter of business policy deemed to be helpful to both itself and the agent, is willing to carry the risk from the date of the policy to the 15th of the next month, but is unwilling to carry the risk beyond that time on credit.* The company does not consider it of any benefit to itself to remain liable longer under the policy on the bare promise of the insured to pay the premium. Extension of further credit might benefit the company, but it is not willing to take the risk. Unconditional extension of further credit would afford the agent an opportunity to collect the premium and thus make his commission, but, if he failed to collect it, he would be out nothing while the company would have carried the risk without compensation. Unconditional extension of further credit would therefore be for the benefit of the agent and against the interest of the company. The agent cannot thus etxend the company's risk without authority from the company and, in consideration for such authority, the agent agrees, for his own benefit, to become liable to the company for its part of the premium whether collected or not. *That liability is a debtor and creditor liability, but it is an additional liability to that of the insured, growing out of a separate, original undertaking on the part of the agent for a consideration, and has no effect upon the contract between the company and the insured except to prevent its termination. In extending further credit the agent acts for the company and by the company's authority.* He extends the life of the contract and thus continues the company's

liability to the insured on the policy and continues the liability of the insured to the company for the premium. It is the company's credit and the company's risk which are extended, and after such extension the company has the promise of the insured to pay the premium and also the promise of the agent to pay the premium less his commission. *The company then depends upon the agent as agent to collect the money from the insured and remit the 'balance' within the sixty-day period or, if he fails to collect as agent, then as independent promisor, to remit the 'balance' in discharge of his separate, original undertaking.*

*"If the agent, both as agent and as independent promisor, fails to remit and his agency is terminated, the company has a valid claim against both the insured and the independent promisor.* The company may proceed against either or both until its claim is satisfied. If it cannot obtain the 'balance' from the independent promisor, it may take charge of the account, collect it, or as much of it as is collectible, and credit the 'balance' with the proceeds. The question of collecting the deficiency from the independent promisor is not material in this case, the master's report recommending that no deficiency judgment be entered for the reason that the value of the accounts and the 'expirations' cannot be determined with exactness and for the further reason that the defendant is insolvent.

"If the agent pays the 'balance' as promisor, he may then later collect the premium and reimburse himself from the proceeds.

"In this case, when the contract of May 24, 1929, was made it appeared that all balances on policies issued prior to December 1, 1928, had been remitted. If those balances had been paid by defendant as independent promisor out of its own money, then the defendant would have had the right to collect the accounts accruing prior to December 1, 1928, and retain the proceeds for its reimbursement. But those balances, to the extent of $4,898.79, were paid from collections on policies written after December 1, 1928; that is to say with money of the insurance companies and not with money of the defendant. Therefore, no right on the part of defendant to collect those accounts and retain the proceeds ever came into existence.

"Ownership of accounts by the insurance company is discussed in decided cases. See *U.S.F. & G. Co.* v. *Sexton*, 134 Ga. 56, 67 S. E. 649; etc., . . . Such ownership was also in effect recognized by the parties to this case in the contract of May 24, 1929.

"Moreover, the master found that, where an agency is terminated and the agent is in arrears in the payment of balances, there exists

a universal custom or recognized course of dealing under which the company is entitled to take the accounts, collect them, and apply the proceeds to the unremitted balance. *The evidence was conflicting as to the custom, but several witnesses testified to its existence and effect.* The finding is amply supported by evidence and under well-recognized principles of practice should not be overturned by the court.''

Appellees also cite the cases of *Central National Bank* v. *Connecticut Mutual Life Ins. Co.*, 104 (XIV Otto) U.S. 54 and *In re Mason Co.*, 254 Fed. 164, but none of them present the position of the appellees more strongly than does the above citation.

We have found it expedient to spread out the jurisprudence relating to this subject matter. In some of the cases, especially in some of the earlier ones, the courts made deductions from the habits and customs that had arisen between the three parties, the companies, the agents and the policyholders. In the case at bar, the contracts between the parties and the stipulation to be found in the record and copied in this opinion, all point to one conclusion, namely, that Gómez was not a mere security for the policyholders, but that his relation with respect to the funds that were due was that of principal, and as between him and the companies the relation of debtor and creditor arose.

The order should be reversed and the case sent back for further proceedings not inconsistent with this opinion.

Mr. Justice Hutchison, dissenting.